## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | ) | |
| | ) | **Magistrate Case No.** |
| **Verizon Pantech, Telephone Number:** | ) | |
| **202-770-5480, Serial Number:** | ) | |
| **125200826498, Model Number:TXT8035B** | ) | |
| | ) | |
| **Verizon Samsung, Telephone Number:** | ) | |
| **404-883-5624** | ) | |
| **MEID HEX: A0000039918D9F.** | ) | **(UNDER SEAL)** |

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Special Agent Stephen R. Naugle of the Federal Bureau of Investigation (FBI), United States Department of Justice, Washington, D.C., (hereinafter affiant) being duly sworn, depose and state the following:

## I.     INTRODUCTION

1.     I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United State Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Section 2516 of Title 18, United States Code.

2.     I have been a Special Agent (SA) with the Federal Bureau of Investigation (FBI) since 1998. I am currently assigned to Squad CR-3 in the FBI's Washington Field Office (WFO), which is responsible for conducting investigations that target drug trafficking organizations.

      3.      a.      Through training and experience, I have become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms that are used to disguise conversations about their narcotics activities.  From experience and training, I have learned, among other things, that: (a) drug traffickers rarely expressly refer to illegal drugs by name; instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocuous words or phrases; (b) narcotics traffickers frequently use cellular telephones, digital telephones, and other communication devices in order to remain in constant or ready communication with one another without restricting either party to a particular location, thus hampering surveillance by law enforcement authorities; (c) narcotics traffickers frequently use cellular telephones and the walkie-talkie or "press to talk," as well as the text messaging features of their cellular telephones to further conceal their communications from law enforcement; (d) drug traffickers periodically "drop" their cellular telephones and acquire new cellular telephones to facilitate their criminal activities in order to thwart detection by law enforcement; (e) drug traffickers utilize multiple telephones subscribed in either their true or fictitious names; (f) it is common for drug traffickers to change their telephone and/or telephone number frequently; (g) it is also common for drug traffickers to separate the usage of each telephone specific to customers, suppliers, and associates; (h) drug traffickers store photographs, videos, and images of themselves, their contraband such as firearms and illicit narcotics, and of their associates on their cellular telephones and other electronic communications devices; and (i) drug traffickers maintain telephone contact lists of these customers, suppliers, and associates within their cellular telephones and other electronic communications devices.

b.      Individuals involved in drug trafficking often maintain records and ledgers evidencing drug trafficking activities in order to keep track of the ordering, purchasing, storage, distribution and transportation of drugs, in their residences and at their businesses.  These records and ledgers may be maintained and stored for long periods of time to memorialize past transactions, the status of the accounts receivable and accounts payable, and the names, identities and telephone numbers of suppliers, customers and co-conspirators.

c.      Individuals involved in drug trafficking must often rely on others to obtain their drugs, store, package, and deliver the drugs, and collect and transfer drug proceeds.  The individuals utilized to fill these roles often have known each other for lengthy periods of time, and frequently, drug traffickers maintain evidence of the identities of these co-conspirators at their residence long after any particular drug transaction is completed.

d.      Individuals involved in drug trafficking commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names third parties to avoid detection by law enforcement while maintaining actual control of these assets; laundering the money through what appears to be a legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; transferring the money through personal or business bank accounts of themselves or others; or using the money to buy assets which are difficult to trace.  Records and other evidence of these and other types of transactions are often found at the residences and businesses of individuals involved in drug trafficking.

e.      Individuals involved in drug trafficking often keep and maintain large amounts of United States currency at their residences and businesses.  Such funds are often used

for every-day expenditures and to maintain and finance their ongoing drug business.  Additionally, individuals involved in drug trafficking often amass and maintain assets at their residence which were generated through their trafficking activities, or purchased with the cash earned from such trafficking, including negotiable and financial instruments such as stocks and bonds, jewelry, and precious metals and stones.

f.      Individuals involved in drug trafficking often maintain weapons, firearms and ammunition on their person or in their residence, vehicles, and businesses.  Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs.  Furthermore, I am aware of instances in which drug traffickers have maintained such items in order to protect themselves and guard their drugs and drug profits, as well as for enforcement purposes during their drug dealings.

g.      Residences, businesses, and other premises, including storage lockers used by individuals involved in drug trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residences, businesses, and other premises.

h.      Individuals involved in drug trafficking use cellular telephones and maintain these items on their person and/or in their residences and at their businesses.  Drug traffickers use cell phones to increase their mobility, coordinate illicit activities, and to provide the drug traffickers with instant access to phone calls and voice messages.  The cell phone enables drug dealers to maintain contact with drug associates, drug suppliers, and drug customers.  Cellular telephones contain wire and electronic data concerning telephonic contact, and text messages with co-conspirators, as well as telephone books containing contact information for co-conspirators.

4

Members of drug trafficking and distribution organizations also utilize cell phones with photograph and video capabilities to take photographs and videos of other members of the drug trafficking and distribution organizations, drugs, money, and assets purchased with drug proceeds.

        i.     Individuals involved in drug trafficking often travel to other areas in order to deliver drugs, meet with drug associates and customers, collect drug proceeds, and transport drug proceeds.  The records of these travels, include, but are not limited to: travel documents, tickets, and receipts; credit card statements documenting the purchase of travel related expenses; bank account records documenting the same; and, commercial airline, rental car, and hotel frequent flyer, mileage, and rewards club statements and other documents which provide a record of travel.  Individuals usually maintain these items on their person and/or at their residences/businesses and often maintain them for long periods of time after any travel is concluded.

        j.     Individuals involved in drug trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with drug proceeds or property utilized to facilitate drug trafficking activities.  Such items are typically maintained in their residences and businesses.

        4.     Since this affidavit is being submitted for the limited purpose of seeking authorization to execute a search warrant for the listed cellular telephones, I have not set forth each and every fact learned during the course of this investigation.  Conversely, I am not aware of any facts which, based on my training and experience, militate against probable cause or exculpate any of the individuals listed as target subjects.  Nor do I request that this Court rely upon any facts not

set forth herein in reviewing this affidavit in support of the application for the search warrant for the target residence.

5.     I submit that the facts contained in this affidavit are accurate, and that they demonstrate that there is probable cause to believe that narcotics proceeds, documents and records, and other instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 1956, as more fully described in **Attachment A**, have been committed, are being committed, and will be committed by ANDRACOS MARSHALL and others not yet fully identified.  Specifically, there is probable cause to believe that the cellular telephones described in Paragraph 6, contain evidence and instrumentalities of violations of the controlled substances laws and money laundering (21 U.S.C. Sections 841, and 846, and 18 U.S.C. 1956).

6.     Your Affiant requests a search warrant to search:

**1. Verizon Pantech Cellular Telephone
Telephone Number: 202-770-5480
Serial Number:  125200826498
Model Number: TXT8035B**

**2. Verizon Samsung, Telephone Number:
Telephone Number: 404-883-5624
MEID HEX: A0000039918D9F**

## II.     FACTS ESTABLISHING PROBABLE CAUSE

7.     The statements contained in this affidavit are based in part on your affiant's own personal observations and investigation or from information provided by Special Agents of the DEA, FBI, ATF, USPIS and officers of the Prince George's County Police Department (PGPD); information provided by confidential sources; and your affiant's experience and background as a Special Agent with the FBI.  Because this affidavit is being submitted for the limited purpose of

securing authorization for a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing a search of the target premises.

8.      In 2010, the Bureau of Alcohol, Tobacco and Firearms (ATF) and the PGPD first began investigating the activities of Ishmael FORD-BEY and his associates.  During the investigation, in December 2010, a member of the FORD-BEY's organization was arrested for narcotics violations and agreed to cooperate with law enforcement.  During subsequent interviews, the cooperating witness advised that his cocaine source of supply was Anthony TATUM, a target of the investigation, and that FORD-BEY was providing TATUM and others with kilogram quantities of cocaine.  At that time, the investigation into TATUM's activities began.  This information has been corroborated by additional confidential informants and surveillance pursuant to a DEA investigation initiated in and around April 2012.

9.      On or about August 15, 2012, the Texas Department of Public Safety ("DPS") stopped a refrigerated box truck.  A search of the refrigerated box truck revealed approximately thirteen boxes each containing approximately nine kilograms of cocaine.  A sample of the substance contained within the box was tested and resulted in a positive reaction for cocaine. During the course of the investigation, agents learned that similar shipments had occurred approximately once per month for the previous two years.  The boxes were destined to be delivered to an individual later identified as FORD-BEY in Temple Hills, Maryland.  A controlled delivery of the thirteen boxes was arranged.  On or about August 17, 2012, law enforcement established surveillance at the pre-determined meeting location in Marlow Heights, Maryland.  The same day, the tractor trailer (followed by surveillance) arrived at the meet

location.   A few minutes later, a vehicle registered to FORD-BEY with an address on Forest Lake Court, Mitchellville, Maryland arrived at the location.   Physical and video surveillance observed the truck driver and FORD-BEY unloading the drugs into the vehicle.   FORD-BEY then entered his vehicle and departed from the area.   Law Enforcement attempted to stop FORD-BEY, but he did not stop and a high-speed pursuit ensued onto Interstate 495.   During the chase, a 2010 Lexus truck bearing Maryland tag 4AD7428, registered to ANDRACOS MARSHALL at 1200 Port Echo Lane, Bowies, Maryland, attempted to interfere with law enforcement's pursuit of FORD-BEY.   Approximately thirty minutes later, the 2010 Lexus truck registered to MARSHALL was again observed by law enforcement.   The driver, subsequently identified as MARSHALL, fled from the truck and eluded capture.   The Lexus truck registered to MMARSHALL was seized by law enforcement and subsequently processed for forfeiture.   As part of the forfeiture process, notice of the forfeiture was sent to the registered owner, ANDRACOS MARSHALL, but no claim for the vehicle filed.   Your affiant submits if MARSHALL was an innocent owner and not the driver of the Lexus truck on August 17, 2012, he would have filed a claim for the Lexus truck.

10.    The truck driver was shown a single photograph of MARSHALL and the truck driver explained that that person is usually the money man.  It was further explained by the truck driver that MARSHALL would arrive with money after FORD-BEY picked up the cocaine to provide money to the truck driver to transport back to the source of the cocaine supplier.

11.    A federal arrest warrant was issued for FORD-BEY, and he was eventually taken into custody on or about August 18, 2013, during a routine traffic stop after he presented a New Jersey license in the name of Jason Green.

12.     According to wage records obtained from the State of Maryland, as of April 2013, TATUM only reported $23,400 in wages in 2010, $56,053 in wages in 2011, and $15,385 in wages in the first quarter of 2012 from 1001 Solutions Inc.

13.     In the last few years, TATUM has kept at least 22 deposit accounts at various banks, including Citibank, SunTrust, Navy Federal Credit Union ("FCU"), and TD Bank, either in his own name or in the names of companies he owns, such as 1001 Solutions, Inc., Beauty International Supply, Inc., and Going Green Towing, Inc.

14.     1001 Solutions Inc. is a company owned by TATUM.   1001 Solutions Inc. purports to be a cleaning and vending machine service that has received over $300,000 in cash deposits from July 2009 through 2011 into its bank accounts.   However, review of the bank records revealed that  the accounts had been used for the  payment of  personal luxury and no discernible expenses related to a cleaning or a vending machine business..

15.     In 2012, TATUM incorporated Beauty International Supply, Inc.  The same year it was incorporated, the company opened a bank account at Citibank.  In the first four months, the account had cash deposits in excess of $93,000 and money order deposits in excess of $45,000, all in rounded amounts.  Citibank closed the account in late 2012 due to suspicious cash transactions not in keeping with its stated business of beauty supply such as the purchase and sales of equipment and products related to cosmetics and/or hair care.

16.     Agents   subsequently   identified   multiple   phone   numbers   associated   with TATUM's business, Beauty International Supply, Inc., one of which is telephone number ending in (202) 765-4787, which is an AT&T cellular phone that was activated on July 10, 2013, with the subscriber name of Beauty International Supply, Inc., located at 145 Fleet St., # 182, Oxon

Hill, Maryland.  This location has been identified as a Post Office (PO) Box utilized by TATUM, as confirmed via physical surveillance by law enforcement on August 21, 2013.

17.     In October 2012, TATUM incorporated Going Green Towing, Inc.  In January 2013, the company opened a bank account at Navy FCU.  TATUM also has maintained accounts for 1001 Solutions, since at least January 2010, and a personal account, since August 2004, with Navy FCU.  Between November 2012 and February 2013, nineteen cash in transactions (deposits or credit card payments) were conducted against the personal and business accounts of TATUM totaling $90,100.  During that same time period, six withdrawals from TATUM's account were made totaling $17,950.  A review of the credit and debit card purchases made from his accounts show purchases from various luxury retailers including Yves Saint Laurent, Avi and Co., Christian Louboutin, Louis Vuitton, Bloomindales, as well as airline, lodging, and auto rental activities in Georgia, New York, Florida, California, Texas, Maryland, Washington, DC, and Virginia.  TATUM also purchased two cashier's checks: $12,500 on November 30, 2012, to Ryder Exchange LLC (a truck rental company) and $24,000 on February 6, 2013, to Audi of Alexandria.  In addition, no transactions were observed that appear to be related to a legitimate towing company.

18.     In October 2011, TATUM purchased a 2010 Land Rover for $60,013.  TATUM paid $22,400 in cash and financed the remaining $37,943 through JP Morgan Chase bank over 72 months at $613.54 per month.  A National Crime Information Center ("NCIC") database query shows the vehicle bearing the same VIN as the Land Rover was last registered in Washington, D.C. to Anthony Torrell TATUM.  The vehicle's tags (DY6910) have been surrendered.  In August 2012, TATUM purchased a 2012 Land Rover RR Ultimate in the name

of Beauty International Supply, Inc. for $139,747.  TATUM paid $40,000 in cash and financed $78,995.97 over 72 months at $1,248.18 per month.  Both vehicle loans balances were paid in-full during 2012.  Agents have been unable to locate either vehicle through physical surveillance, to date.  Additionally, according to DMV records, those vehicles are no longer registered.  Additionally, between 2009 and 2011, TATUM deposited over $650,000 in cash into his bank accounts.

19.     Your affiant believes, based on his experience and training, that TATUM's income cannot sustain his expenditures and the reason that he is able to do this is because he is involved in illegal trafficking of narcotics.  I submit that the sheer volume of cash deposits and withdrawals, as well as his connections to known drug dealers, establishes probable cause to believe that TATUM is involved drug trafficking in violation of 21 U.S.C. §§ 841(a)(1) and 846 as well as money laundering in violation of 18 U.S.C. §§ 1956 and 1957.  Since he makes wages far smaller than his deposits and is nominally self-employed, there is sufficient evidence to show probable cause that TATUM is collecting the cash prior to depositing it.  Further, based on my training and experience investigating drug conspiracies, it is reasonable to believe that after withdrawing cash from the accounts he is transferring it to others involved in the conspiracy.

20.     On August 13, 2013, the Honorable Theresa Carroll Buchanan of the Eastern District of Virginia issued a tracking warrant for the vehicle used by Anthony Torell TATUM, a 2013 Audi S5 Quattro registered in TATUM's name and located in the state of Virginia at TATUM's residence.  On August 15, 2013, law enforcement installed the aforementioned tracker on TATUM's Audi.

21.     Law enforcement has since conducted a review of the GPS data gathered by the tracker on TATUM's Audi S5 Quattro, hereinafter referred to as "the tracker," on a daily basis. On August 16, 2013, the tracker showed TATUM traveled to what was later determined to be the location of a storage locker, 9211 Livingston Road, Fort Washington, Maryland, the location of the Extra Space Storage Company.  The tracker showed TATUM at this facility at approximately 3:46 p.m. and again at approximately 5:44 p.m.   On August 17, 2013, the tracker showed TATUM return to the storage facility at approximately 6:41 p.m.   On August 20, 2013, the tracker again returned to this location at approximately 6:57 p.m.

22.     On August 22, 2013, law enforcement traveled to 9211 Livingston Road, Fort Washington, Maryland and served an administrative subpoena on the Extra Space Storage business.  Agents were subsequently able to determine that an individual named Brandon ROSS was currently renting Storage Locker # F670.  Furthermore, the staff of the facility explained to agents that each tenant is issued a personal code that must be used at the front gate in order for the gate to allow them access.  Agents were able to determine that the code that had been issued to the renter using the name Brandon ROSS had accessed the facility on August 16, 17 and 20, 2013.   Agents then conducted a Maryland DMV check for the name Brandon ROSS, and according to the DMV records a Brandon Francis ROSS does, in fact, possess a Maryland driver's license, and that on July 29, 2013, his address was changed to 145 Fleet Street, Suite 182, Oxon Hill, Maryland, the exact same Post Office Box that is currently utilized by Anthony TATUM.  It was also determined according to available criminal indices that ROSS has multiple arrests related to assault and possession of narcotics in the Washington, DC area.  Your affiant believes that TATUM had the storage locker rented in ROSS' name in order to distance himself

from this location and thwart the efforts of law enforcement. Your affiant knows that this practice is common among narcotics traffickers.

23.     On August 24, 2013, at approximately 9:44 a.m., the tracker showed TATUM return to the storage facility.  The tracker then showed TATUM departed the storage facility at approximately 9:52 a.m., and travel directly to the Navy Federal Credit Union, located at 7001 Berry Road in Accokeek, Maryland, where he arrived at approximately 10:50 a.m., and remained for approximately one hour.  As described above, agents have identified multiple bank accounts associated with TATUM at Navy FCU.  Later that same day, the tracker showed TATUM return to the storage facility at approximately 6:39 p.m., 9:04 p.m., and again at 10:06 p.m.

24.     A confidential source who has previously provided information which has proven to be truthful, advised law enforcement that as a result of the arrest of FORD-BEY, which occurred on or about August 17, 2013, TATUM was attempting to unload his supply of drugs and had recently delivered 3 kilograms to one of his distributors.

25.     On August 27, 2013, the Honorable William Connelly of the District of Maryland issued a search and seizure warrant with delayed notification for the Extra Space Storage Locker F670.  On August 28, 2013, agents from DEA, FBI, USPIS and the PGPD surreptitiously executed the search warrant.  Agents found and seized approximately 1 ½ kilograms of cocaine, 200 grams of heroin, an assault rifle and a vacuum sealer.  Also photographed in the locker was a shipping box which was addressed to Anthony TATUM at 145 Fleet Street, #182, Oxon Hill, Maryland, which is the post office box listed to 1001 Solutions, Inc.

26.     On August 29, 2013, at approximately 12:50 p.m., TATUM was observed at 9211 Livingston Road, Fort Washington, Maryland, Extra Space Storage Locker F670, by law

enforcement removing items from the storage unit.  Law enforcement followed TATUM from Extra Space Storage to Self Storage Zone, 5335 Beech Road, Temple Hills, Maryland.   Law enforcement then followed TATUM from Self Storage Zone to 3850 Tunlaw Road, N.W., Washington, D.C., which is an apartment building.  TATUM parked in the front parking lot of the apartment building, removed a duffle bag from the trunk of a Audi registered in his name and carried the duffle bag along the side of the building.  TATUM returned to the Audi approximately five minutes later without the duffle bag and drove out of the parking lot.  At this time surveillance was discontinued.

27.     On September 6, 2013, a search warrant was issue d for Unit 2170 located at the Self Storage Zone, 5335 Beech Road, Temple Hills, Maryland.  According to the records of Self Storage Zone, the unit had been leased in the name of 1001 Solutions, c/o of Anthony TATUM.  During execution of the search warrant, agents seized a loaded handgun, scales, plastic baggies and cutting agents.  In addition, agents seized drug residue from a glass table. The drug residue field-tested positive for heroin.  Based upon the items seized and the observations made in the storage locker, it is clear that this storage locker was being used to cut and repackaged drugs for distribution.

28.     On September 10, 2013, your affiant provided Eaves by Avalon/Smith Property Holdings Van Ness L.P. an administrative subpoena seeking a tenant roster for 3850 Tunlaw Road, Northwest, Washington, D.C.  At this time employees were also shown fourteen (14) photographs, to include photographs of FORD-BEY, MARSHALL and TATUM. MARSHALL was identified as the occupant of apartment 214.  A copy of the lease for Apartment 214 was obtained and the individual identified on the lease is Antione W. Tuppince,

date of birth, April 24, 1979.   Tuppince entered into a twelve-month lease that began on February 22, 2013.  Tuppince appears to be an actual person.  FORD-BEY and TATUM were both identified as visiting Apartment 214.  Based upon your affiant's experience, it is common practice for drug dealers to obtain apartments in another person's name to secure narcotics proceeds, documents and records, and other instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 1956.

29.      On September 27, 2013, the Honorable United States Magistrate Judge, John M. Facciola, authorized a United States District Court search warrant for 3850 Tunlaw Road, Northwest, Apartment 214, Washington, D.C.  The search warrant was executed on October 1, 2013, at approximately 10:35 a.m. Items seized from the apartment included approximately 200 grams of cocaine and drug packaging items. A safe was located in the bedroom closet which contained $823,640.00 in United States currency and two cellular telephones.

30.    Based on the aforementioned, your affiant believes that probable cause exists that MARSHALL and others known and unknown have engaged in a conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. §§ 841 and 846, and that stored within the two cellular telephones are evidence and instrumentalities of that conspiracy, as well as evidence of laundering of narcotics proceeds, as set forth more fully in this affidavit in support of an application for the issuance of the search warrant, which is hereby incorporated by reference.

_____
Stephen R. Naugle, Special Agent
Federal Bureau of Investigation
United States Department of Justice

SWORN TO AND SUBSCRIBED before me this _____ day of October, 2013.

_____
Deborah A. Robinson
United States Magistrate Judge

16